# EXHIBIT 7

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA SUPERIOR DE SAN JUAN

| | |
|---|---|
| PEDRO J. SANTIAGO MÉNDEZ, y LA CLASE COMPUESTA POR TODOS LOS CONSUMIDORES DE ENERGÍA ELÉCTRICA RESIDENCIALES BAJO LA TARIFA RESIDENCIAL GENERAL, CLIENTES DE LA AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO. | CIVIL NÚM. K PE2016-0618 (902)<br><br>Sobre: Reclamación bajo la Ley de Acción de Clase por Consumidores de Bienes y Servicios, según enmendada; Enriquecimiento Injusto, Daños, Violación Ley de Monopolios, Interdicto Permanente |
| Demandantes, | |
| v., | |
| AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO, su Junta de Gobierno compuesta por HARRY RODRÍGUEZ GARCÍA, LUIS BENÍTEZ HERNÁNDEZ, CARLOS BONILLA AGOSTO, ENID MONGE PASTRANA, LUIS SANTINI GAUDIER, CARLOS GALLISÁ BISBAL, MIGUEL A. TORRES DÍAZ (miembro ex officio), ALBERTO BACÓ BAGUÉ (miembro ex officio), DEMANDADOS A-Z, todos miembros desconocidos de la Junta de Gobierno de la AUTORIDAD DE ENERGÍA ELÉCTRICA; EL ESTADO LIBRE ASOCIADO DE PUERTO RICO, REPRESENTADO POR SU SECRETARIO DE JUSTICIA HON . CÉSAR MIRANDA EN SU CAPACIDAD OFICIAL; Aseguradoras A, B, C; Richard Roe y Jane Doe, PETROBRAS AMERICA, INC., SHELL TRADING (US) COMPANY, PETROWEST, INC., VITOL, S.A., VITOL, INC., y DEMANDADOS DESCONOCIDOS1-100 | |
| Demandados. | |

MOCIÓN SOLICITANDO DESESTIMACIÓN DE DEMANDA ENMENDADA

COMPARECE la co-demandada Petrobras América, Inc. ("PAI"), por conducto de la representación legal que suscribe, y muy respetuosamente solicita la desestimación de la Demanda Enmendada de epígrafe por las razones que se exponen a continuación:

## I. **INTRODUCCIÓN**

El Sr. Pedro J. Santiago Méndez ("el demandante" o "Santiago Méndez") presentó la Demanda Enmendada de epígrafe el 5 de mayo de 2016,[1] bajo las disposiciones de la *Ley de Acción de Clase por Consumidores de Bienes y Servicios*, según enmendada, 32 L.P.R.A. §§ 3341-3344 ("LACC"). Santiago Méndez presentó la Demanda Enmendada en su carácter personal y como demandante representativo de todos los consumidores residenciales de la Autoridad de Energía Eléctrica de Puerto Rico ("AEE"), bajo la tarifa de Servicio Residencial General ("GRS", por sus siglas en inglés).

La Demanda Enmendada alega, en síntesis, que la AEE durante los últimos diez (10) años ha adquirido, en combinación y conspiración con, entre otros, los suplidores demandados,[2] combustibles fósiles para operar las plantas de producción de energía que son de menor calidad a la requerida por los parámetros establecidos en las solicitudes de propuestas de la AEE y en la reglamentación federal y estatal aplicable.[3] Véase Demanda Enmendada, a las págs. 2 & 6. El demandante sostiene que la AEE procedió a incluir el costo en exceso de dichas compras—esto es, la diferencia entre el valor en el mercado del combustible que se supone adquirió (combustible requerido) y lo que sería el costo en el mercado de aquel que realmente utilizó (combustible inferior)—en el renglón de la factura correspondiente a la llamada "cláusula de ajuste de combustible" ("cláusula de ajuste"). Es decir, el demandante sostiene que la alegada diferencia en el valor del combustible le fue transferida a los clientes residenciales de la tarifa GRS de la AEE. Id., a la pág. 2.

El demandante alega, además, que la AEE ha añadido indebidamente a la cláusula de ajuste numerosos costos adicionales, a saber: (1) el llamado factor. 89, que representa el costo del acuerdo existente entre la AEE y los municipios de Puerto Rico mediante el cual la AEE permite a los municipios utilizar energía eléctrica libre de costo a cambio de ser exonerada del pago de las contribuciones municipales que de ordinario

---

[1] La Demanda original fue presentada el 19 de febrero de 2016.

[2] Además de la AEE y PAI, el demandante incluye como demandados a la Junta de Gobierno de la AEE y sus miembros ("Junta de Gobierno"), el Estado Libre Asociado de Puerto Rico ("ELA"), Shell Trading (US) Company ("STUSCO"), Petrowest, Inc. ("Petrowest"), Vitol, S.A., Vitol, Inc., y demandados desconocidos.

[3] En lo sucesivo, y para facilitar la discusión, nos referiremos al combustible que cumple con los parámetros como "combustible requerido", y aquel que no los cumple como "combustible inferior".

tendría que pagar; (2) subsidios legislados y tarifas preferenciales a hoteles, hospitales, iglesias, servicios agrícolas, ciudadanos mayores de 65 años, recipientes del Programa de Asistencia Nutricional, residentes de residenciales públicos, crédito a pequeños comerciantes, entre otros; (3) el factor "Ei", que pretende recobrar el costo de la energía perdida, hurtada y sin contabilizar, y (4) costos relacionados con la falta de eficiencia térmica ("heat rate") de las plantas generatrices y (5) los ajustes "c" y "c1" de la cláusula de ajuste, que es la diferencia entre la totalidad del costo del combustible y la energía adquirido por la AEE y lo recuperado por la cláusula de ajuste. <u>Véase</u> Demanda Enmendada, a la pág. 2. El demandante sostiene que todos estos cargos se le transfieren ilícitamente a los consumidores residenciales de la tarifa GRS, a través de la cláusula de ajuste, por lo que solicita el reembolso de todos los dineros cobrados impropiamente durante los pasados diez (10) años a la clase de consumidores de la AEE que propone representar. <u>Id.</u>, a la pág. 3.

La Demanda Enmendada también alega que la AEE incurre en trato desigual, pues alegadamente le permite a corporaciones públicas y agencias del ELA operar con deudas multimillonarias sin suspenderles el servicio, pero a los clientes residenciales se lo interrumpen luego de un retraso mínimo. <u>Id.</u>, a las pág. 2 & 8-10. El demandante alega que estos costos de facturación realizada pero no cobrada a entidades gubernamentales también se le pasan al consumidor residencial como parte de los ajustes "c" y "c1"de la cláusula de ajuste. <u>Id.</u>, a las págs. 2-3.

A base de las alegaciones antes descritas, la Demanda Enmendada presenta cuatro causas de acción en contra de los demandados. No obstante, solamente las causas de acción presentadas en la Sección XI de la Demanda Enmendada están dirigidas a los suplidores de combustible. Esta Sección XI de la Demanda Enmendada contiene una reclamación bajo los Artículos 2 y 12 de la Ley de Monopolios de Puerto Rico ("Ley de Monopolios"), 10 L.P.R.A. §§ 257 <u>et seq.</u>, y otra bajo el Artículo 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. § 5141. Específicamente, la Sección XI de la Demanda Enmendada alega que "[l]a actuación de la AEE y su Junta de Gobierno en común acuerdo, colusión y/o conspiración con las codemandadas Petrowest, Petrobras, Shell y Vitol 1 y V [sic], para suplirle a la AEE combustible no conforme a las especificaciones requeridas aunque representando en la documentación de embarque que sí lo hacía," constituye una violación a los estatutos antes citados. <u>Véase</u> Demanda

3

Enmendada, a las págs. 19-20, ¶¶ A(1), B(1). Además, el demandante reclama la imposición de triple daño al amparo del citado Artículo 12 de la Ley de Monopolios. Id., a la pág. 19, ¶ A(4).

La Demanda Enmendada debe ser desestimada en cuanto a PAI por varias razones. En primer lugar, aun tomando como ciertas las alegaciones del demandante, éste no alega la existencia de un daño concreto que le confiera legitimación activa bajo la Ley de Monopolios. Según la Demanda Enmendada, la conducta ilegal que se le imputa a los demandados es que "[d]urante los últimos 10 años, la AEE y su Junta de Gobierno, con conocimiento de causa, ha estado adquiriendo combustibles fósiles de los suplidores co-demandados los cuales no cumplen con los criterios de calidad" requeridos, "pero pagando como si cumplieran con los mismos". Id., a la pág. 7, ¶ 13. Según el demandante, la alegada conducta ilegal se ha realizado por todos los demandados en "común acuerdo, colusión y/o conspiración" entre ellos. Id., a la pág. 19, Sección XI, ¶ A(1). El daño alegado por el demandante y los miembros de la clase propuesta consiste en que los costos asociados al sobrepago del combustible alegadamente inferior se les han transferido íntegramente a los consumidores residenciales de la AEE a través de la cláusula de ajuste. Id., a la pág. 7, ¶ 12.

Según lo anterior, el alegado daño consiste en que el demandante y la alegada clase pagaron de más por el producto que obtuvo la AEE de sus suplidores de combustible. Sin embargo, como se demostrará en esta Moción, el demandante y la clase propuesta hubiesen pagado lo mismo bajo la cláusula de ajuste independientemente del alegado acuerdo o conspiración anticompetitiva de los demandados. Ello es así, pues, las regulaciones y contratos pertinentes no le permiten a la AEE adquirir cualquier tipo de combustible (e.g. el más económico), sino que le requieren comprar combustible que cumpla con las reglamentaciones ambientales federales y estatales pertinentes. Por consiguiente, el demandado y los consumidores residenciales hubiesen pagado en sus facturas el mismo precio—esto es, el precio de combustible requerido—aun si no hubiese existido el alegado esquema entre los demandados. Así pues, el argumento del demandante de que hubiese pagado menos en su factura a no ser por la alegada conducta de los demandados, es completamente inmeritorio.

En segundo lugar,  aun presumiendo que el demandante en efecto recibió facturas con sobrecargos, éste aún carecería de legitimación activa bajo la Ley de Monopolios para reclamarle a PAI.  Esto es así toda vez que el daño alegado—i.e. la transferencia al consumidor de cargos en exceso bajo la cláusula de ajuste—no es el resultado directo de alguna conducta de PAI.   PAI no es quien le factura a los consumidores de energía de Puerto Rico, ni tiene ninguna participación en ese ejercicio o en la aplicación de la cláusula de ajuste.  Esa es una función que únicamente realiza la AEE. El demandante tampoco tiene relación contractual alguna con PAI. Con quien único PAI tuvo una relación contractual fue con la AEE, y a dicha corporación pública fue a quien PAI le vendió el combustible. Por consiguiente, la causa directa del daño alegado por el demandante no es ninguna conducta atribuible a PAI. Habida cuenta de que el daño que alega el demandante no surge "por razón de" la conducta que se le imputa a PAI, como lo requiere el Artículo 12 de la Ley de Monopolios, el demandante no tiene legitimación para reclamarle a PAI.

En tercer lugar, aun si presumimos para propósitos argumentativos que PAI vendió combustible de calidad inferior a la AEE (lo que se niega), el demandante no tendría capacidad para reclamarle a PAI por imperativo de la doctrina del "comprador indirecto". La referida doctrina fue desarrollada por el Tribunal Supremo Federal precisamente para dilucidar la legitimación activa de un reclamante bajo las leyes antimonopolísticas federales de las cuales se derivan los Artículos 2 y 12 de la Ley de Monopolios. Bajo dicha doctrina, los compradores indirectos no tienen legitimación en causa aunque aleguen que los daños le fueron transferidos ("passed on") por la víctima directa. Véase Kansas v. Utilicorp United Inc., 497 U.S. 199 (1990); Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977). La doctrina del "comprador indirecto" debe aplicarse al caso de marras toda vez que, según la norma establecida en el caso de Pressure Vessels P.R. v. Empire Gas P.R., 137 D.P.R. 497 (1994), para evaluar la suficiencia de las alegaciones de una demanda presentada bajo el palio de la Ley de Monopolios, el juzgador debe examinar el texto de dicho estatuto y la "jurisprudencia federal interpretativa de los estatutos federales análogos." Id., a la pág. 508. En el caso de autos, el análisis del Artículo 12 de la Ley de Monopolios y de la jurisprudencia interpretativa del estatuto federal análogo (Sección 4 del Clayton Act) nos conduce

inexorablemente a desestimar la causa de acción bajo la doctrina del "comprador indirecto", como se demostrará más adelante.

En cuarto lugar, y presumiendo para propósitos argumentativos que el demandante puede alegar un daño directo y concreto (lo que se niega), la causa de acción bajo la Ley de Monopolios aun debería desestimarse toda vez que, por sus propios términos,  dicho estatuto no aplica al comercio interestatal; es decir, al comercio entre Puerto Rico y otras localidades más allá de sus fronteras. Concretamente, el Artículo 2 de la Ley de Monopolios dispone diáfanamente que "[t]odo contrato, combinación en forma de trust o en otra forma, o conspiración para restringir irrazonablemente los negocios o el comercio *en el Estado Libre Asociado de Puerto Rico o en cualquier sector de éste, por la presente se declaran ilegales...*". 10 L.P.R.A. § 258. (Énfasis suplido).  Habida cuenta de que PAI es una corporación organizada bajo las leyes del estado de Delaware, con oficinas en Houston, TX, y los cargamentos de combustible que ésta enviaba a la AEE salían de puertos fuera de Puerto Rico, las transacciones objeto de esta Demanda Enmendada están forzosamente en el comercio interestatal, por lo que las disposiciones de la Ley de Monopolios no le son de aplicación.

En quinto lugar, la causa de acción bajo la Ley de Monopolios debe desestimarse por estar prescrita. Según las propias alegaciones del demandante, cualquier causa de acción que éste pudo haber tenido bajo dicho estatuto surgió hace por lo menos 10 años. Véase e.g. Demanda Enmendada, a las págs. 6 ¶ 5, 7 ¶13. El término prescriptivo bajo los Artículos 2 y 12 de la Ley de Monopolios es de cuatro (4) años desde el nacimiento de la causa de acción. En el caso de autos, la reclamación fue presentada ya expirado el referido término prescriptivo, y la Demanda Enmendada no contiene ninguna alegación que sugiera que el demandante interrumpió dicho término. Por consiguiente, la causa de acción bajo la Ley de Monopolios prescribió hace varios años.

En sexto lugar, el demandante solicita remedios bajo los Artículos 2 y 12 de la Ley de Monopolios. Sin embargo, sus alegaciones son insuficientes para establecer los elementos de una causa de acción bajo dichos artículos que, según la ley y jurisprudencia aplicables, requieren que se alegue lo siguiente: (1) deberá existir algún contrato, combinación, o conspiración entre dos o más entidades separadas; (2) el cual

restringe irrazonablemente los negocios o el comercio (3) en Puerto Rico o en cualquier sector de éste. Pressure Vessels P.R, 137 D.P.R. a la pág. 509. Como veremos, aunque el demandante alega conclusoriamente que existe una conspiración para defraudar a los clientes de la AEE, éste no presenta alegaciones específicas sobre la alegada conspiración. Al no alegar de forma concreta los detalles de la supuesta conspiración para defraudar, el demandante incumple con la Regla 7.2 de Procedimiento Civil, 32 L.P.R.A. Ap. V. R. 7.2, que requiere que "en todas las aseveraciones de fraude o error, las circunstancias que constituyen el fraude o error deberán exponerse detalladamente". Además, las alegaciones de la Demanda Enmendada incumplen con los criterios de suficiencia y plausibilidad requeridos por el caso de Twombly v. Bell Atlantic, 550 U.S. 544 (2007),[4] caso que involucra las leyes antimonopolísticas federales y que es actualmente el referente autoritativo sobre suficiencia de las alegaciones en la esfera federal, y cuya norma y raciocinio ya han sido adoptadas por el Tribunal de Apelaciones de Puerto Rico. La aplicación de la norma de Twombly al caso de autos es también adecuada en virtud de lo establecido en el citado caso de Pressure Vessel.

En séptimo lugar, las alegaciones de la Demanda Enmendada tampoco dan base a una causa de acción bajo el Artículo 1802 del Código Civil de Puerto Rico. Ello, pues, el demandante no ha alegado un daño concreto que requiera ser resarcido bajo dicho estatuto. Y, en caso que pudiera demostrar tal daño, éste no fue causado por ningún acto u omisión de PAI, pues PAI no participa en el proceso de facturación a los clientes de la AEE. De cualquier forma, la causa de acción bajo el Artículo 1802 estaría prescrita por las mismas razones que se discuten en cuanto a la prescripción de la causa de acción bajo la Ley de Monopolios. En el caso del Artículo 1802 del Código Civil, el término prescriptivo es de un (1) año desde que se conocieron los alegados daños.

Por último, la Demanda Enmendada debe ser desestimada por dejar de acumular partes indispensables. Estas partes indispensables son los laboratorios que según la Demanda Enmendada también participaron en el esquema alegado. También señalamos que, por información y creencia, otros suplidores pueden haberle suplido

---

[4] Como se discutirá más adelante, la norma enunciada en Twombly fue reiterada y expandida a casos más allá del ámbito de las leyes antimonopolio en Ashcroft v. Iqbal, 556 U.S. 662 (2009).

combustible a la AEE durante el periodo descrito en la Demanda Enmendada. Sin embargo, solamente se incluyen como demandados a PAI, STUSCO, Vitol, S.A., Vitol, Inc. y Petrowest.

A la luz de los argumentos que anteceden, procede desestimar con perjuicio todas las reclamaciones en contra de PAI.

## II.   ARGUMENTACIÓN

### A. *La Demanda Enmendada debe ser desestimada pues el demandante carece de legitimación activa*

Los reclamos que se exponen en la Demanda Enmendada tienen como base la existencia de un alegado esquema mediante el cual el demandante y la alegada clase pagaron de más por el combustible que la AEE obtuvo de PAI y otros suplidores, pues éste era de menor calidad al requerido por las regulaciones y contratos pertinentes. El demandante alega que el combustible de inferior calidad tenía un valor menor que el combustible requerido, pero que a los clientes de la AEE se les cobró el valor de combustible requerido mediante la cláusula de ajuste. En otras palabras, el demandante plantea que la AEE debió cobrarles a los clientes el costo menor del combustible adquirido, y solicita que se le reembolse la diferencia entre el precio pagado (precio del combustible requerido) y el precio que debió pagar (precio de combustible inferior que alegadamente se suplió).

El demandante presentó la Demanda Enmendada bajo las disposiciones de la *Ley de Acción de Clase por Consumidores de Bienes y Servicios*, según enmendada, 32 L.P.R.A. §§ 3341-3344 ("LACC"). La LACC, sin embargo, no crea una causa de acción sustantiva a favor del demandante, por lo que éste tiene que apoyar su causa de acción en otras fuentes sustantivas de derecho.[5]  En este caso, Santiago Méndez presenta en contra de PAI una causa de acción predicada en los Artículos 2 y 12 de la Ley de Monopolios. El Artículo 2 de la Ley de Monopolios dispone lo siguiente:

> Todo contrato, combinación en forma de trust o en otra forma, o
> conspiración para restringir irrazonablemente los negocios o el comercio

---

[5] En Guzmán v. Vaquería Tres Monjitas, 169 D.P.R. 705, 723 (2006) el Tribunal Supremo de Puerto Rico estableció que la LACC es un mecanismo procesal que no creó una modalidad de acción de clase distinta a la establecida por la Regla 20 de Procedimiento Civil, por lo que no crea una causa de acción sustantiva. Ello fue reconocido en la jurisdicción federal en los casos Díaz v. Hyundai, 431 F. Supp. 2d 209, 212 (D. P.R. 2006) confirmado por Díaz v. Hyundai, 501 F. 3d 12, 15-16 (1er Cir. 2007); Rivera Muñiz v. Horizon Lines, Inc., 737 F. Supp. 2d 57, 64 (D. P.R. 2010) ("...[the Puerto Rico Consumer Class Action Act] does not create substantive rights and therefore cannot be the basis for an independent cause of action"); Simonet v. SmithKline Beecham, 506 F. Supp. 2d 77, 91 (D.P.R. 2007) ("The law is limited to authorizing the filing of class actions by consumers for damages when they have a cause of action under existing law.")

en el Estado Libre Asociado de Puerto Rico o en cualquier sector de éste, por la presente se declaran ilegales y toda persona que haga tales contratos o se comprometa en tales combinaciones o conspiraciones incurrirá en delito menos grave.

10 L.P.R.A. § 258.

A su vez, el Artículo 12 de dicho estatuto establece, en lo pertinente, que:

(a) Cualquier persona que sea perjudicada en sus negocios o propiedades por otra persona, por razón de actos, o intentos de actos, prohibidos o declarados ilegales por las disposiciones de este capítulo, salvo las de las secs. 259 y 261 de este título, puede demandar a causa de dichos actos ante el Tribunal de Primera Instancia y tendrá derecho a recobrar tres (3) veces el importe de los daños y perjuicios que haya sufrido, más las costas del procedimiento y una suma razonable para honorarios de abogado.

10 L.P.R.A. § 268 (a).

En síntesis, el Artículo 12 de la Ley de Monopolios establece tres elementos para que una persona pueda reclamar a su amparo: (1) que la persona sea perjudicada en sus negocios o propiedades; (2) por razón de; (3) actos o intentos de actos prohibidos bajo la Ley de Monopolios (excepto violaciones a los Artículos 3 y 5). Véase Pressure Vessels, 137 D.P.R. a la pág. 518.

En el caso de autos, el demandante carece de legitimación activa por dos razones principales. Primero, el demandante no ha experimentado ningún daño a sus negocios o propiedad según los propios hechos esbozados en la Demanda Enmendada. Segundo, no existe una relación causal directa entre la conducta imputada a PAI y el daño alegado. Es decir, el daño que alega el demandante no surge "por razón de" la conducta que se le imputa a PAI. Al analizar este tema, debemos tener presente que, como advierte un importante comentarista, "[a]ntitrust standing is distinct from constitutional standing, in which a mere showing of harm in fact will establish the necessary injury."1 Callmann on Unfair Comp., Tr. & Mono. § 4:49 (4th Ed.). La legitimación activa en casos bajo las leyes antimonopolios debe evaluarse a base de los criterios delineados por el estatuto en cuestión, en este caso el Artículo 12 de la Ley de Monopolios.

(1) **Según las alegaciones de la Demanda Enmendada, el demandante no sufrió ningún daño a sus negocios o propiedades, por lo que no tiene legitimación activa bajo la Ley de Monopolios**

Según la Demanda Enmendada, la AEE compra el combustible que se utiliza para generar electricidad—mayormente combustible Números 2 y 6—mediante el

mecanismo de requerimiento de propuestas. Véase Demanda Enmendada, pág. 6, ¶¶ 5-6. El costo de dicho combustible se considera en la tarifa básica a un costo nóminal, y cualquier exceso entre dicho valor nominal del combustible en la tarifa básica y el costo real de adquirir el mismo, se recupera a través de la cláusula de ajuste. Id. a la pág. 5, ¶ 2. La llamada cláusula de ajuste incluye, por lo tanto, el exceso del costo del combustible sobre una base de costo de combustible en la tarifa básica. Id. a la pág. 5, ¶ 3.

La AEE, sin embargo, no tiene la libertad de comprar cualquier tipo de combustible disponible en el mercado en ese momento. Por ejemplo, la AEE no puede comprar, sin más, el combustible que mejor precio tenga en ese momento. Según la Demanda Enmendada, la AEE emite unas solicitudes de propuesta en la cual establece los parámetros de calidad del combustible a ser adquirido. Id. a la pág. 6, ¶ 9. Los suplidores de combustible, entre estos PAI, someten sus propuestas a base de las especificaciones establecidas por la AEE. Específicamente, se requieren parámetros de contenido de azufre en el combustible (típicamente 0.50% o menos), valor calorífico o "BTU", viscosidad, gravedad específica y el nivel de otras sustancias en el combustible. Id. El demandante explica que los parámetros descritos surgen de las reglamentaciones federales y/o estatales aplicables. Id. Asimismo, el demandante sostiene que "[t]odos estos parámetros inciden en la calidad y por consiguiente en el precio del combustible adquirido por la AEE...[a] más estrictos los parámetros, mayor el precio." Id. a la pág. 6, ¶ 10.

A la luz de lo anterior, el alegado daño del demandante es inexistente conforme a las propias alegaciones del demandante. El argumento del demandante es, en síntesis, que debido a las acciones imputadas a los demandados, él y los clientes residenciales de la AEE tuvieron que pagar de más bajo el renglón de ajuste por combustible. Sin embargo, la propia Demanda Enmendada expresa que la AEE tiene que comprar el combustible requerido, que tiene un costo mayor. Dado que la AEE no tiene discreción para comprar combustible que no sea el requerido, el costo mayor de éste se les hubiese transferido a los clientes de la AEE independientemente de la existencia del alegado fraude de los demandados. **Es decir, el argumento del demandante de que hubiese pagado menos en su factura a no ser por la alegada conducta de los demandados, es completamente inmeritorio.**

El argumento del demandante supone que la AEE tenía la prerrogativa de comprar el combustible inferior y pasarle el costo menor de éste al consumidor. Pero según las propias alegaciones de la Demanda Enmendada, ese escenario no es posible. Como a los clientes residenciales de la AEE—i.e. la alegada clase—se les hubiese pasado comoquiera el precio correspondiente al combustible requerido, ni el demandante ni los clientes residenciales sufrieron un daño real y concreto a sus bolsillos como resultado del alegado esquema. Toda vez que ni el demandante ni la clase propuesta sufrieron ningún daño concreto a sus negocios o propiedad, éstos no tienen legitimación activa para reclamar bajo el Artículo 12 de la Ley de Monopolios.

### (2) No existe una relación causal directa entre el daño alegado en la Demanda Enmendada y la conducta de PAI

Aun presumiendo que el demandante en efecto recibió facturas con sobrecargos, éste aún carecería de legitimación activa bajo la Ley de Monopolios para reclamarle *a PAI*. Esto es así toda vez que el daño alegado—la transferencia al consumidor de cargos en exceso bajo la cláusula de ajuste—no es el resultado directo de ninguna conducta de PAI. PAI no es quien le factura a los consumidores de energía de Puerto Rico, ni tiene ninguna participación en ese ejercicio o en la aplicación de la cláusula de ajuste. PAI no tiene ninguna injerencia en la decisión de incluir los costos del combustible adquirido en la cláusula de ajuste, ni en la determinación de cuánto dinero va a cargarse a los clientes bajo dicho renglón. Esa es una función que únicamente realiza la AEE, a base de unas guías y cálculos que PAI desconoce.

Más aún, el demandante no tiene relación contractual alguna con PAI. Con quien único PAI tuvo una relación contractual fue con la AEE, y a dicha corporación pública fue a quien se le vendió el combustible. Por consiguiente, la causa directa del daño alegado por el demandante (si existiera) no es ninguna conducta atribuible a PAI. Es decir, no se configura, bajo el Artículo 12 de la Ley de Monopolios, un daño a los negocios o propiedad del demandante *por razón de* actos atribuibles a PAI. Pressure Vessels, 137 D.P.R. a la pág. 518.

### (3) El demandante no tiene una causa de acción disponible para reclamar en contra de PAI por imperativo de la doctrina del "comprador indirecto"

Aun si presumimos para propósitos argumentativos que PAI vendió combustible de calidad inferior a la AEE, lo que PAI niega enfáticamente, ello no le conferiría

legitimación activa automáticamente al demandante para reclamarle a PAI.  Veamos el
porqué.

La Demanda Enmendada alega que los suplidores de combustible demandados,
entre ellos PAI, vendieron combustible de inferior calidad al precio de combustible
requerido. Sin embargo, ni el demandante ni ningún cliente residencial de la AEE
compraron combustible a PAI.  En las ocasiones en que PAI le suplió combustible a la
AEE, los contratos en cuestión fueron exclusivamente entre PAI y la AEE. El
demandante y los clientes residenciales solamente compraron *electricidad* a la AEE, la
cual se generó en parte, del combustible adquirido por la AEE de distintos suplidores. A
pesar de ello,  el demandante alega tener una causa de acción bajo el Artículo 2 de la
Ley de Monopolios simplemente porque la AEE pasó el costo del combustible de menor
calidad a sus clientes residenciales mediante la cláusula de ajuste. Sin embargo, este
tipo de relación indirecta y atenuada entre la conducta del demandado, en este caso
PAI, y el daño alegado, es insuficiente para conferir legitimación activa al demandante.
Toda vez que el demandante es un comprador indirecto de combustible, éste carece de
legitimación activa de conformidad con las doctrinas aplicables del derecho federal de
monopolios, extensivas a casos bajo la Ley de Monopolios en virtud de lo resuelto por
el Tribunal Supremo de Puerto Rico en el citado caso de Pressure Vessels, 137 D.P.R.
a la pág. 508. Veamos.

El demandante presenta su reclamo en el caso de autos bajo los Artículos 2 y 12
de la Ley de Monopolios. 10 L.P.R.A. §§ 258, 268. Al analizar este caso el Tribunal no
debe perder de perspectiva que, según surge del citado caso de Pressure Vessels, la
Ley de Monopolios de Puerto Rico debe interpretarse en armonía con las leyes
federales antimonopolios.  Pressure Vessels, 137 D.P.R. a la pág. 508.
Específicamente, en dicho caso, que giraba en torno a la suficiencia de las alegaciones
de una demanda presentada bajo la Ley de Monopolios, el Tribunal Supremo explicó
que  "[al examinar los requisitos de cada una de las causas de acción invocadas, nos
remitiremos al texto de la [Ley de Monopolios], así como a los principios ilustrativos que

se pueden hallar en la jurisprudencial federal interpretativa de los estatutos federales análogos[.]"[6] Id.

A lo largo de su Opinión en Pressure Vessels, el Tribunal Supremo destacó las similitudes entre la Ley de Monopolios y los estatutos federales análogos, a saber, el *Sherman Act* y el *Clayton Act. Id.,* a las págs. 508-525. En específico, el Tribunal Supremo reconoció expresamente en Pressure Vessels que el Artículo 2 de la Ley de Monopolios proviene de la Sección 1 del *Sherman Act,* y que el Artículo 12 del estatuto local "es el equivalente en términos generales de la Sección 4 del *Clayton Act*". Id., a las págs. 509 & 518. A raíz de ello, ese Alto Foro descansó considerablemente en jurisprudencia federal—principalmente del Tribunal Supremo Federal—al interpretar la Ley de Monopolios y resolver la controversia ante sí.   PAI sostiene que, conforme a la norma de Pressure Vessels, la determinación sobre si el demandante tiene legitimación activa debe resolverse a base de la arraigada doctrina del "comprador indirecto", establecida por el Tribunal Supremo Federal en los casos de Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977) y Kansas v. UtiliCorp United, Inc., 497 U.S. 199 (1990), y reiterada y aplicada por múltiples tribunales federales y estatales posteriormente.

En Illinois Brick, el Tribunal Supremo Federal resolvió que un comprador indirecto no tiene legitimación activa para reclamar daños bajo el *Sherman Act.* Los demandantes en Illinois Brick eran el estado de Illinois y varias entidades gubernamentales locales que compraron edificios construidos, en parte, con bloques de concreto manufacturados por la parte demandada. Illinois Brick, 431 U.S. a la pág. 726. Los demandantes alegaban que los manufactureros de los bloques utilizados para la construcción de los edificios conspiraron para fijar precios ("price-fixing") en contravención del *Sherman Act.* Los demandantes eran compradores indirectos de los manufactureros de bloques, pues estos últimos le vendían los bloques de concreto a contratistas en albañilería, quienes los utilizaban en los trabajos que realizaban para los contratistas generales que tenían a su cargo la construcción de los edificios que luego adquirían los demandantes. Para justificar su legitimación para reclamar, los demandantes argumentaron que habían sufrido un daño porque los compradores

---

[6] El Tribunal explicó que analizaría el caso de ese modo porque "nunca hemos abordado este tema sistemáticamente." Ese Alto Foro también expresó que al interpretar dicha ley también tendría presente el historial legislativo de la Ley de Monopolios. Id.

directos—i.e. los contratistas de albañilería—no absorbían los sobrecargos resultantes de la fijación de precios, sino que se los "pasaron" a sus clientes.

Sin embargo, el Tribunal Supremo Federal resolvió que los demandantes eran compradores indirectos y, como tal, no tenían legitimación activa para reclamar, rechazando así la teoría de que la transferencia del sobrecargo por parte de los compradores directos les confería legitimación.  El Tribunal Supremo Federal justificó este curso decisorio explicando que el permitir a un comprador indirecto reclamar a base de una teoría de transferencia del daño ("pass-on theory") sería contraproducente por las siguientes razones: (1) adoptar la teoría de transferencia del daño crearía un riesgo de exposición múltiple para los demandados; (2) la teoría de transferencia del daño complicaría los casos, pues los tribunales se verían obligados a determinar los diferentes cargos que se transfirieron en las diferentes etapas de la cadena; y (3) proscribir las causas de acción presentadas por compradores indirectos a base de teorías de transferencia de daño le permite a los tribunales aplicar más efectivamente las leyes antimonopolios, pues éstos pueden concentrarse en la recuperación de la totalidad del daño, que se concentra en los compradores directos. Illinois Brick, 431 U.S. a la pág. 730, 732, 734-735.

La doctrina de "comprador indirecto" fue reafirmada por el Tribunal Supremo Federal en el citado caso de Utilicorp. En Utilicorp, caso con unas alegaciones muy similares al caso de marras, el tribunal definió la controversia en los siguientes términos: "Debemos determinar quién puede demandar bajo la § 4 del Clayton Act, por violaciones a las leyes antimonopolios, cuando suplidores de gas natural cobran de más a una compañía de servicios públicos ("public utility") y ésta, as su vez, le pasa los sobrecargos a sus clientes".[7] UtiliCorp, 497 U.S. a la pág. 204. (Traducción nuestra). Citando a Illinois Brick, el Tribunal Supremo Federal resolvió que en la situación planteada solamente la compañía de servicios públicos tenía derecho a una causa de acción en contra de los suplidores de gas natural, pues solamente ella es la que sufre un daño conforme a la Sección 4 del Clayton Act.

---

[7] El texto original en inglés lee de la siguiente manera: "We must decide who may sue under § 4 when, in violation of the antitrust laws, suppliers overcharge a public utility for natural gas and the utility passes on the overcharge to its customers." UtiliCorp, 497 U.S. a la pág. 204.

En el caso de autos, bajo el raciocinio de <u>Illinois Brick</u> y <u>Utilicorp</u>, es claro que el demandante y los clientes residenciales de la AEE son compradores indirectos del combustible que PAI le suple a la AEE y, como tal, no pueden demandar a PAI por la alegada venta de combustible inferior. Si presumimos para propósitos de esta moción que las alegaciones del demandante son ciertas (lo que se niega), la parte que realmente sufrió un daño a causa de la alegada venta de combustible inferior fue la AEE, pues a ésta fue a quien alegadamente se le vendió el producto a sobre precio. El demandante no tiene relación contractual alguna con PAI, y PAI no le vendió combustible a éste. Con quien único PAI tuvo una relación contractual fue con la AEE, y a dicha corporación pública fue a quien se le vendió el combustible. La AEE es una corporación pública que, conforme al Artículo 2.02 de la Ley General de Corporaciones de Puerto Rico, tiene capacidad para demandar y ser demandada. 14 L.P.R.A. § 2652. Por consiguiente, la AEE tiene capacidad para vindicar sus daños ante los foros apropiados.

PAI también sostiene que las razones citadas por el Tribunal Supremo Federal en <u>Illinois Brick</u> para justificar la doctrina de "comprador indirecto" aplican cabalmente al caso de marras. Permitir la reclamación del demandante ciertamente colocaría a los demandados en riesgo de exponerse a múltiples reclamaciones, pues existen otras partes (e.g. la AEE) que también podrían reclamar a los suplidores. Además, permitir que prosiga la causa de acción a base de una teoría de transferencia de daño complicaría innecesariamente el caso. Ello, pues, el tribunal tendría que determinar la cuantía exacta de la cláusula de ajuste que corresponde a los cargos supuestamente transferidos. Ello conllevaría inevitablemente la creación y aplicación de fórmulas complejas por parte del Tribunal para precisar qué partes de los cargos facturados a los clientes, si alguna, corresponden a sobrecargos y no a fluctuaciones reales en el precio del petróleo. Esto ejercicio se complica si consideramos las considerables fluctuaciones que ha experimentado el precio del petróleo en los últimos daños. Si el caso se certificara como uno de clase las complicaciones serían mayores, pues se tendría que tomar en cuenta cómo se afectaron los miembros de la clase a raíz de la alegada conspiración. En fin, el permitir al demandante reclamar a base de una teoría de transferencia de daños podría abrir las puertas a un litigio inmanejable.

En esta coyuntura, es menester mencionar que la Legislatura de Puerto Rico no ha enmendado la Ley de Monopolios para permitir demandas promovidas por compradores indirectos. Esto es importante porque luego de la decisión de <u>Illinois Brick</u>, algunos estados enmendaron sus leyes de monopolios para permitir demandas por compradores indirectos. El Tribunal Supremo Federal ha evaluado ese tipo de leyes y las ha sostenido como un ejercicio legislativo válido de esos estados. <u>Véase California v. ARC America Corp.</u>, 490 U.S. 93, 105-106. En Puerto Rico, sin embargo, no se ha tomado una acción en esa dirección. En ausencia de una determinación legislativa permitiendo demandas de compradores indirectos, y habida cuenta de que <u>Pressure Vessels</u> no rechazó la doctrina de "comprador indirecto" de <u>Illinois Brick</u> y <u>Utilicorp</u>,[8] es forzoso concluir que el demandante carece de legitimación activa para promover su causa de acción bajo la Ley de Monopolios. <u>Véase e.g. In re TFT-LCD (Flat Panel) Antitrust Litigation</u>, 599 F. Supp. 2d 1179, 1186-1188 (N. D. Cal. 2009) (resolviendo que compradores indirectos no tenían legitimación activa para reclamar bajo la Ley de Monopolios de Puerto Rico, pues luego de <u>Illinois Brick</u> la Legislatura de Puerto Rico tuvo la oportunidad de enmendar la ley para permitir demandas por compradores indirectos, pero optó por no hacerlo).

En fin, el demandante carece de legitimación activa para reclamarle a PAI por cualquiera de los tres argumentos discutidos en las páginas que anteceden. La falta de legitimación activa del demandante es suficiente para disponer de la reclamación de éste bajo la Ley de Monopolios. Solicitamos muy respetuosamente al Honorable Tribunal que desestime la causa de acción presentada al amparo de dicho estatuto en virtud de los fundamentos antes planteados. No obstante, procede la desestimación de las reclamaciones en contra de PAI por cualquiera, o todos, los fundamentos que se discuten a continuación.

### B. La causa de acción es improcedente en derecho pues los hechos alegados involucran comercio interestatal, y la Ley de Monopolios aplica solamente a comercio dentro de Puerto Rico

El Artículo 2 de la Ley de Monopolios dispone que "[t]odo contrato, combinación en forma de trust o en otra forma, o conspiración para restringir irrazonablemente los

---

[8] El <u>Pressure Vessels</u> no trataba de reclamaciones de adquirientes indirectos. El Tribunal Supremo de Puerto Rico observó en dicho caso que durante la últimas dos décadas el requisito de causalidad de la Sección 4 del Clayton Act ha sido objeto de novedosas y complejas interpretaciones en el ámbito federal. Al explicar este punto, el Tribunal hace referencia a la jurisprudencia federal que impone el deber de probar "antitrust injury" y "antitrust standing", pero no menciona (mucho menos rechaza) la doctrina de "comprador indirecto". <u>Pressure Vessels</u>, 137 D.P.R. a la pág. 518-519.

negocios o el comercio en el **Estado Libre Asociado de Puerto Rico o en cualquier sector de éste, por la presente se declaran ilegales…**". 10 L.P.R.A. § 258. (Énfasis suplido). Así pues, conforme a los propios términos de la Ley de Monopolios, ésta solamente aplica a conducta que ocurra "en el Estado Libre Asociado de Puerto Rico". Id. Por consiguiente, la Ley de Monopolios solamente regula, como máximo, conducta dentro de todo Puerto Rico, y no se extiende más allá de los límites geográficos de la Isla.

En el caso de autos, PAI es una corporación organizada bajo las leyes del estado de Delaware, con oficinas en Houston, Texas. Por ello, mientras tuvo contratos de suministro de combustible con la AEE, PAI enviaba los cargamentos de combustible destinados a dicha corporación pública de puertos fuera de Puerto Rico. En vista de que las alegaciones de la Demanda Enmendada involucran presuntas actuaciones de PAI en el comercio interestatal—es decir, fuera de los límites geográficos de Puerto Rico—la causa de acción bajo la Ley de Monopolios debe ser desestimada en cuanto a ésta.

Al analizar este argumento, este Honorable Tribunal no debe perder de perspectiva que "[c]uando la letra de la ley es clara y libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir con su espíritu". 31 L.P.R.A. § 14. Por ello, "el texto claro de una ley es la expresión por excelencia de la intención legislativa". Pueblo v. Castro Muñiz, 118 D.P.R. 625, 650 (1987) (Op. Disidente del Juez Asociado señor Rebollo López).

Asimismo, apuntamos que a que, al interpretar estatutos antimonopolísticos de otros estados con lenguaje análogo al de nuestra Ley de Monopolios, los tribunales han concluido que éstos no aplican al comercio interestatal. Véase e.g. Arnold v. Microsoft Corp., No. 00-CI-00123, 2000 WL 36114007 (Ky. Cir. Ct. July 21, 2000) (resolviendo, bajo las leyes de Kentucky, que "[t]he Sherman Act applies to anticompetitive and predatory acts to maintain monopoly power in actions 'among the several states'. In other words, the parties must be in two separate states, interstate. KRS 367.175 applies to the same behavior but uses the phrase "in this Commonwealth". In other words, the parties must be in the same state, intrastate."); In re Microsoft Corp. Antitrust Litig. MDL No. 1332, 2003 WL 22070561, a la * 2 (D. Md Aug 22, 2003) (resolviendo que el estatuto antimonopolístico de Mississippi no alcanza "interstate anticompetitive

conduct affecting intrastate commerce within Mississippi"); Sun Dun, Inc. of Washington v. Coca-Cola Co., 740 F. Supp. 381, 397 (D. Md 1990) (decidiendo que el demandante podía recobrar bajo el estatuto antimonopolios del Distrito de Columbia sólo por compras "[that] do not involve an interstate link").

En fin, aun presumiendo que la parte demandante tuviera legitimación activa para reclamarle a PAI—lo que se niega—la Demanda Enmendada tendría que desestimarse pues la Ley de Monopolios no aplica a conducta realizada en el comercio interestatal. Este argumento también es suficiente para disponer de la reclamación presentada en cuanto a PAI bajo la Ley de Monopolios.

### C. La causa de acción bajo la Ley de Monopolios debe ser desestimada toda vez que la misma está prescrita

Presumiendo para propósitos argumentativos que el demandante puede alegar un daño directo y concreto a sus negocios o propiedad causado por PAI (lo que se niega), la causa de acción bajo la Ley de Monopolios debe desestimarse por estar prescrita.

El citado Artículo 12 de la Ley de Monopolios dispone, en su inciso (c), lo siguiente:

> (c) La acción judicial para recobrar daños de conformidad con las disposiciones de los incisos (a) y (b) de esta sección deberá iniciarse dentro del término de cuatro (4) años a partir del nacimiento de la causa de acción.

10 L.P.R.A. § 268.

La Ley de Monopolios no define ni explica que significa la frase "a partir del nacimiento de la causa de acción". Tampoco hemos encontrado jurisprudencia de Puerto Rico que lo discuta. No obstante, si seguimos la norma establecida por el Tribunal Supremo de Puerto Rico en Pressure Vessels, y nos referimos a las leyes federales antimonopolios para determinar cuándo nace una causa de acción para propósitos de computar el término prescriptivo, encontramos que ésta debe ejercitarse desde el momento en que ocurrió el daño alegado. Véase Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971) ("Generally, [an antitrust cause] of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.... This much is plain from the treble-damage statute itself"); Beneficial Standard Life Insurance Co. v. Madariaga, 851 F.2d 271, 274–75 (9th Cir.1988) ("In [antitrust] actions governed by 15 U.S.C. § 15b, the plaintiff's knowledge

is generally irrelevant to accrual, which is determined according to the date on which injury occurs"); 4 Callmann on Unfair Comp., Tr. & Mono. § 23:32 n. 2.50 (4th Ed.) ("The U.S. Supreme Court and the overwhelming majority of Circuits have clearly held that claims under the Sherman Act are subject to an injury rule, rather than a discovery rule").

En el caso de autos, según las propias alegaciones del demandante, cualquier causa de acción que pudo haber tenido éste surgió hace por lo menos 10 años, pues ese es el momento en que se alega comenzó el supuesto esquema violatorio de la Ley de Monopolios. Véase e.g. Demanda Enmendada, a la pág. 6 ¶ 5, pág. 7 ¶13.  Un examen de la Demanda Enmendada revela que ésta no contiene ninguna alegación que sugiera que el demandante interrumpió el término prescriptivo aplicable de cuatro (4) años.  En vista de que el demandante alega que el supuesto esquema ilegal comenzó hace diez años—o sea, en el 2006—y habida cuenta de que no se alega ninguna interrupción de término, éste debió presentar su demanda en el año 2010. El demandante, sin embargo, presentó su reclamación el 19 de febrero de 2016.

No obstante, si asumiéramos la postura más favorable al demandante, e interpretáramos el Artículo 12(c) de la Ley de Monopolios conforme a la teoría cognoscitiva del daño, conocida en el derecho federal como "discovery rule"— teoría que ha sido rechazada en el contexto de reclamaciones bajo los estatutos antimonopolios, según se explica arriba— la causa de acción del demandante estaría igualmente prescrita.

El Tribunal Supremo ha reconocido la teoría cognoscitiva del daño como una excepción a la norma de que un término prescriptivo comienza a transcurrir cuando objetivamente ocurre el daño ("injury rule"). La teoría cognoscitiva establece que una causa de acción en particular surge cuando el perjudicado descubrió el daño y quién lo causó, y conoció los elementos necesarios para poder ejercitar efectivamente su causa de acción. Santiago v. Ríos Alonso, 156 D.P.R. 181, 189 (2002). Bajo este estándar, el término para ejercer una acción no comienza a transcurrir cuando se sufre el daño, sino cuando se conocen los elementos necesarios para ejercitar la acción. Padín v. Cía. Fom. Ind., 150 D.P.R. 403, 411 (2000). No obstante, el Tribunal Supremo ha recalcado que si el desconocimiento se debe a falta de diligencia, entonces no son aplicables estas consideraciones sobre la prescripción. Id., citando a Vega v. J. Pérez & Cía., Inc.,

135 D.P.R. 746 (1994). Por ello, bajo la teoría cognoscitiva el término prescriptivo de una acción se computa desde que la víctima supo **o debió saber** del daño causado y quién lo causó. <u>CSMPR v. Carlo Marrero</u>, 182 D.P.R. 411, 427 n. 54 (2011).

Según se discutió antes, en el caso que nos ocupa los hechos que se le imputan a los demandados se remontan, según el propio demandante, a hace por lo menos 10 años. La Demanda Enmendada no establece que el demandante conociera de los hechos y daños alegados en una fecha distinta, por lo que debe presumirse que el daño y el conocimiento del mismo fueron simultáneos (o, por lo menos, contemporáneos). Así pues, aun bajo esta alternativa, basada en las propias alegaciones del demandante, la Demanda Enmendada también debió presentarse en el año 2010, cosa que no se hizo.

Cabe señalar que, independientemente de lo que se alega en la Demanda Enmendada, si el Tribunal fuera a determinar cuándo el demandante *debió saber* de los daños en que se basa su demanda, el demandante estaría en una posición aún más precaria. Esto es así porque las alegaciones esenciales de la causa de acción en contra de PAI bajo la Ley de Monopolios han estado en la palestra pública desde por lo menos el año 1999. Específicamente, las alegaciones referentes al alegado recibo de combustible inferior, y aceptado como bueno por la AEE, ha sido objeto de discusión en casos judiciales, informes de la Oficina del Contralor, proyectos de ley y notas de prensa durante los últimos quince años. También ha sido objeto de una amplia discusión pública la alegada mal utilización de la cláusula de ajuste.

Para demostrar lo anterior, PAI solicita muy respetuosamente que el Honorable Tribunal tome conocimiento judicial de los siguientes hechos, que son susceptibles de corroboración inmediata y exacta mediante fuentes cuya existencia no puede ser razonablemente cuestionada.[9] <u>Véase</u> Regla 201(b)(2) de Evidencia de 2009, 32 L.P.R.A. Ap. VI R. 201. Primero, que en el año 1999 se presentó en el Tribunal Federal el caso <u>Negrón v. Caleb Brett</u>, USDC PR Civil No. 99-1797, en el cual se alegó que alrededor de 500-600 pruebas de laboratorio habían sido alteradas con el propósito de

---

[9] El Prof. Chiesa explica que "[e]sta regla permite al tribunal tomar conocimiento judicial de hechos que son indisputables "por razón de la fácil, precisa e inmediata verificación del hecho, con la ayuda de fuentes confiables". E. Chiesa, <u>Tratado de Derecho Probatorio: Reglas de Evidencia de Puerto Rico y Federales</u>, Tomo II, p. 1138, (Publicaciones JTS, 1998). Entre los ejemplos que Chiesa provee de hechos susceptibles de determinación inmediata y exacta se encuentran los siguientes: ... 7) **récords judiciales o administrativos.** <u>Id.</u>, a las págs. 1139-1142.

que combustible fuera de especificaciones fuera aceptado como combustible dentro de las especificaciones. Este caso eventualmente fue atendido por el Tribunal de Apelaciones para el Primer Circuito ("Primer Circuito"), y los hechos y detalles del mismo—que son esencialmente similares a los que se alegan en la Demanda Enmendada de epígrafe—se publicaron en una opinión de 24 de mayo de 2000. Negrón v. Caleb Brett U.S.A., Inc., 212 F.3d 666 (1st Cir. 2000). El demandante y cualquier otro cliente de la AEE supieron o debieron saber del supuesto esquema, y de sus alegados daños, en ese momento. Sin embargo, esperaron más de dieciséis (16) años para presentar su reclamo.[10]

Segundo, el 13 de mayo de 2002, la Oficina del Contralor de Puerto Rico emitió un informe en el cual resumió los hallazgos de una auditoría que dicha oficina realizara a la AEE. El informe del Contralor mencionó específicamente el litigio de Negron v. Caleb Brett en los tribunales federales, y cómo la auditoría de su oficina había encontrado ciertas irregularidades en los procesos de pruebas y compra de combustible en la AEE. El referido informe también señala que las irregularidades detectadas podían causar el que se desembolsaran indebidamente fondos públicos para pagar un precio mayor por combustible de calidad inferior, que es precisamente lo que el demandante alega en este caso. El informe del Contralor de 13 de mayo de 2002 es un documento oficial de una entidad del Gobierno de Puerto Rico, que está disponible al público en la siguiente dirección de Internet: www.ocpr.gov/informes_en_PDF/pdf_2001_2002/cp/cp-02-26.pdf. Por ser un documento público susceptible de corroboración inmediata y exacta mediante fuentes cuya existencia no puede ser razonablemente cuestionada, solicitamos que se tome conocimiento judicial de este informe.

---

[10] El Tribunal de Apelaciones de Puerto Rico ha tomado conocimiento judicial de una acusación federal emitida por un gran jurado del caso criminal, del tracto procesal de un caso criminal federal, y de una alegación acordada y los hechos estipulados por el peticionario y la fiscalía federal del caso criminal. Véase Pueblo v. Lutgardo Acevedo, KLCE201500803, 2015 WL 5005229, a la * 2 n. 11, 12 & 14. En Berríos & Longo v. Advanced Computer Technology, KLAN201302060, 2014 WL 5112402, a la * 1, el Tribunal de Apelaciones reconoció que el Tribunal de Primera Instancia tomó conocimiento judicial de la existencia de, entre otros, un caso pendiente ante el Tribunal Federal de Quiebras para el Distrito de Puerto Rico y determinó que estaban "íntimamente relacionados con los hechos en que se fundamenta la demanda instada en este caso". Véase además In re Dubón Otero, 159 D.P.R. 550 (2003) (Tribunal Supremo de Puerto Rico toma conocimiento judicial de que el Tribunal Supremo de Estados Unidos confirmó un dictamen del Primer Circuito); Santana Baez v. E.L.A., KLAN201500433, 2015 WL 5005078, a la * 1 n. 2. (Tribunal de Apelaciones toma conocimiento judicial de los acuerdos transaccionales en el caso civil dirimido en el Tribunal Federal del Distrito de Puerto Rico, Carlos Morales Feliciano, et al, v. Luis Fortuño Burset, 79–4 (PJB–LM).

Luego de la publicación del Informe del Contralor, una Comisión Conjunta Especial de la Legislatura realizó una vista pública. Dicha vista fue reseñada en un artículo periodístico en la edición del 19 de junio de 2002 de *El Nuevo Día*. Dicho artículo resume los hallazgos del Informe del Contralor que, como mencionamos, gira en torno a los temas que el demandante plantea en la Demanda Enmendada. El artículo publicado por *El Nuevo Día* está disponible en la siguiente dirección electrónica:

http://www.adendi.com/archivo.asp?num=507337&year=2002&month=6&keyword,   y también es susceptible de conocimiento judicial.

Tercero, también solicitamos que se tome conocimiento judicial del caso PREPA v. Caleb Brett USA, et al., Civil No. 02- 02210, presentado en el 2002 ante el Tribunal Federal para el Distrito de Puerto Rico, y en el cual se alegaban violaciones al RICO Act, incumplimiento de contrato y fraude. Se alegaba en este caso que Caleb Brett, una compañía de laboratorio que la AEE contrataba para determinar si el combustible que se adquiría cumplía con los parámetros requeridos, en concierto y acuerdo con ciertos suplidores de combustible, falsificaron resultados de pruebas para que combustible que no cumplía con los parámetros requeridos fuera aceptado por la AEE. El caso de PREPA v. Caleb Brett demuestra, nuevamente, que aproximadamente catorce (14) años antes de que se presentara la Demanda Enmendada de epígrafe, ya las alegaciones esenciales de ésta estaban en el dominio público y accesibles al demandante y la ciudadanía en general.

Cuarto, entre el 2005 y el 2009, la Legislatura de Puerto Rico introdujo varias resoluciones relacionadas con investigaciones sobre la cláusula de ajuste, el costo del petróleo y el impacto de estos factores en las facturas de los clientes de la AEE. Todas estas resoluciones están disponibles al público a través del portal electrónico de la Oficina de Servicios Legislativos en http://www.oslpr.org/, y solicitamos que se tome conocimiento judicial de las siguientes, por tratar sobre asuntos relacionados a las alegaciones de la Demanda Enmendada: (1) RS1160 de 30 de noviembre de 2001; (2) RC2372 de 20 de junio de 2005; (3) RC2664 de 25 de agosto de 2005;  y (4) RS0007 de 2 de enero de 2009.

Quinto, si por alguna razón el demandante no pudo conocer de los casos de Caleb Brett, el Informe del Contralor y los proyectos legislativos antes reseñados, el

alegado esquema de la utilización de la cláusula de ajuste para pasar los sobrecargos relacionados con la compra de combustible inferior fue objeto de discusión pública una vez más en el año 2009. Específicamente, en la edición del 31 de agosto de 2009 del periódico de circulación general *El Vocero* se publicó un artículo titulado "Nos pasan factura millonaria", en el cual se describió una situación relacionada con la alegada falsificación de pruebas de laboratorio para alterar el contenido calorífico del combustible que la AEE adquiría. Según el artículo, las alegadas alteraciones tuvieron un impacto en el precio del combustible adquirido por la AEE, y que los costos asociados con ello fueron transferidos a los clientes a través de la cláusula de ajuste. Este artículo está disponible en la siguiente dirección electrónica, y solicitamos que se tome conocimiento judicial de éste:http://www.doctorshoper.com/content.html?content=5F80F7C6C81430E6A84909E E9C2FDECF. Previo a este artículo periodístico, el tema también se discutió en otro artículo que también es fácilmente verificable en su dirección electrónica: Carlos Marquez, Is Prepa Prepared to Take Puerto Rico into the 21st Century?, Puerto Rico Herald, 14 de Julio de 2005.[11]

Como se puede observar, las alegaciones en las que se basa la Demanda Enmendada han estado en la palestra pública desde hace más de quince (15) años. **Adviértase que los hechos de los cuales solicitamos que se tome conocimiento judicial no es sobre la veracidad de la información contenida en los informes o reportes de prensa, sino sobre el hecho de que los procesos de compra de combustible en la AEE y la cláusula de ajuste han sido objeto de una extensa cobertura mediática y señalamientos públicos por las pasadas dos décadas.[12]** Por ende, si el demandante no obtuvo conocimiento de ello fue simplemente por falta de diligencia.

---

[11] http://www.puertorico-herald.org/issues2/2005/vol09n28/CBPrepaPrepared.html, ("Over the past few years, the Comptroller's Office has issued seven reports covering various areas of PREPA's operations, including findings regarding the acquisition of fuel and overcharges on the electricity bill.").

[12] Un tribunal puede considerar asuntos susceptibles de conocimiento judicial—como sentencias y procesos judiciales—sin convertir la moción de desestimación en una de sentencia sumaria. Véase 5A Wright & Miller, Federal Practice and Procedure,§ 1364, págs. 475-80 (1990). Esta conclusión se extiende a artículos de periódico susceptibles de conocimiento judicial. Garber v. Legg Mason Inc., 347 Fed. App'x 665 (2d Cir. Sept. 30, 2009)(explicando que "on a motion to dismiss" the court "may consider matters of which judicial notice may be taken, including the fact [of] press coverage . . . without regard to the truth of their content"); United States v. Moreno, 815 F.2d 725, 755 (1st Cir. 1987) (expresando que "district court took judicial notice of the content of all newspapers of general circulation in Puerto Rico during the period of 1979 to the present").

A la luz de lo anterior, es menester concluir que la causa de acción presentada bajo el palio de la Ley de Monopolios está prescrita bajo cualquiera de las alternativas discutidas. Es de rigor señalar que el transcurso del término establecido por ley para reclamar un derecho, sin que el titular del mismo lo reclame, da lugar a la presunción legal de abandono. Lo anterior, y la exigencia de nuestro ordenamiento jurídico de eliminar la incertidumbre de las relaciones jurídicas, justifican la desestimación de la referida causa de acción.

**D. La reclamación del demandante bajo el Artículo 2 de la Ley de Monopolios debe ser desestimada pues la Demanda Enmendada no alega con suficiencia los elementos para que se configure una causa de acción plausible bajo dicho artículo**

El demandante solicita remedios bajo los Artículos 2 y 12 de la Ley de Monopolios. Sin embargo, sus alegaciones son insuficientes para establecer los elementos de una causa de acción bajo el referido Artículo 2, que requiere se establezcan los siguientes tres requisitos: (1) la existencia de algún contrato, combinación, o conspiración entre dos o más entidades separadas; (2) el cual restringe irrazonablemente los negocios o el comercio (3) en Puerto Rico o en cualquier sector de éste. Pressure Vessels P.R, 137 D.P.R. a la pág. 509.

A su vez, la suficiencia de las alegaciones en el caso de autos debe evaluarse a la luz de dos elementos principales. De una parte, en la medida que el demandante alega que los demandados incurrieron en conducta fraudulenta, sus alegaciones deben cumplir con las disposiciones de la Regla 7.2 de Procedimiento Civil, 32 L.P.R.A. Ap. V. R. 7.2, que requiere que "en todas las aseveraciones de fraude o error, las circunstancias que constituyen el fraude o error deberán exponerse detalladamente". Al analizar esta regla, el comentarista Cuevas Segarra ha explicado que en casos en los que se alegue fraude, "se ha requerido que la alegación con particularidad identifique con quién, qué, porqué y dónde fue el fraude". J. A. Cuevas Segarra, Tratado de Derecho Procesal Civil, Tomo II, 2da. Edición 2011, San Juan, Pub. JTS, pág. 433.

De otra parte, las alegaciones de la Demanda Enmendada deben cumplir con los criterios de suficiencia y plausibilidad requeridos por el caso de Bell Atlantic v. Twombly, 550 U.S. 544 (2007), según reiterado por Ashcroft v. Iqbal, 556 U.S. 662 (2009). Aunque el citado caso de Pressure Vessels expresa que las alegaciones en un

caso bajo la Ley de Monopolios deben evaluarse liberalmente a favor de la parte demandante, y que la "demanda no deberá desestimarse a menos que se desprenda con toda certeza que el demandante no tiene derecho a remedio alguno bajo cualquier estado de hechos que puedan ser probados en apoyo de su reclamación," ese criterio no debe ser aplicado en el caso de autos. Ello es así toda vez que el lenguaje de "cualquier estado de hechos que puedan ser probados en apoyo de su reclamación" surge del caso de Conley v. Gibson, 355 U.S. 41, 47-48 (1957), citado expresamente por el Tribunal Supremo en la página 506 de Pressure Vessels. Sin embargo, el criterio de "cualquier estado de hechos" de Conley fue abandonado en Twombly,[13] por lo que la norma de este último debe regir ahora en nuestro ordenamiento, en vez de la superada regla de Conley. Particularmente en casos bajo las leyes antimonopolio.

En Twombly, la parte demandante y otros consumidores presentaron una acción de clase en contra de Bell Atlantic Corporation y otras compañías de telecomunicaciones, alegando que éstas violaron la Sección 1 del *Sherman Act* al conspirar para evitar la competencia entre ellas y frustrar la entrada de nueva competencia. En específico, la demanda alegaba que las compañías demandadas acordaron no expandir operaciones para no competir en territorios que ya ocupan otras de ellas, a pesar de que la Ley Federal de Telecomunicaciones de 1996 facilitaba dichas expansiones.

El Tribunal Federal para el Distrito del Sur de New York ("Tribunal de Distrito") declaró con lugar la moción de desestimación presentada por Bell Atlantic, pues concluyó que Twombly no pudo presentar alegaciones suficientes de la cual pudiera inferirse una conspiración. Twombly v. Bell Atlantic, 331 F. Supp. 2d 174, 182 (S.D.N.Y. 2003) ("Plaintiffs must allege facts from which a conspiracy can be inferred in order to state a claim under § 1"). El Tribunal de Distrito concluyó que para poder alegar con suficiencia una conspiración en violación a la Sección 1 del *Sherman Act*, Twombly tenía que alegar algo más que una renuencia de las demandadas a expandir sus negocios. Id., a las págs.179-181. Luego de analizar las alegaciones de la demanda, el Tribunal de Distrito concluyó que Twombly no había alegado ese factor adicional, pues la conducta en la que alegadamente incurrieron las demandadas bien pudo estar

---

[13] Véase Twombly, 550 U.S. a la pág. 562-563, discutido más adelante.

motivada por consideraciones legítimas de negocios y no por virtud de una conspiración. Id., a las págs.188-189.

Luego de que el Tribunal de Apelaciones para el Segundo Circuito revocara la decisión del Tribunal de Distrito, el asunto llegó ante la consideración del Tribunal Supremo Federal. Ese Alto Foro resolvió, en votación 7-2, que una persona que reclame bajo la Sección 1 del *Sherman Act* tiene que alegar hechos que, tomados como ciertos, sugieran un acuerdo conspirativo, cosa que no pudo hacer Twombly. Twombly, 550 U.S. a la pág. 564-566. La opinión del Tribunal Supremo explica que "[s]in más, conducta paralela entre las compañías demandadas no sugiere la existencia de una conspiración", y añadió que una "alegación de conducta paralela necesita de algún indicio que sugiera un acuerdo conspirativo". Id., a la pág. 557. (Traducción nuestra). Esto es, una reclamación bajo la Sección 1 del *Sherman Act* (análoga al Artículo 2 de la Ley de Monopolios) sobrevive solamente si contiene hechos que plausiblemente sugieran la existencia de una conspiración. Id. Al evaluar las alegaciones de Twombly bajo este crisol, el Tribunal concluyó que "toda vez que aquí los demandantes no han podido hacer que sus reclamaciones crucen la línea que divide lo concebible de lo plausible, su demanda debe ser desestimada". Id., a la pág. 570. (Traducción nuestra).

Es importante reiterar que, al así resolver, el Tribunal Supremo Federal revocó el lenguaje de "cualquier estado de hechos" del caso de Conley, que fue la base para que el Tribunal Supremo de Puerto Rico concluyera en Pressure Vessels que las alegaciones en casos bajo el Artículo 2 de la Ley de Monopolios debían interpretarse liberalmente. En específico, el Supremo Federal expresó que "podríamos seguir discutiendo ejemplos, pero no hay necesidad de proveer citas adicionales para demostrar que el lenguaje de 'cualquier estado de hechos' ("no set of facts") ha sido cuestionado, criticado y explicado lo suficiente…y luego de haber confundido a la profesión por 50 años, esta famosa frase se ha ganado su retiro." Id., a la pág. 562-563. (Traducción nuestra).

Posteriormente, en Ashcroft v. Iqbal, 556 U.S. 662 (2009), el Tribunal Supremo Federal reiteró la norma de Twombly y la extendió más allá del ámbito de las leyes antimonopolio. Ahora, bajo la norma de Twombly/Iqbal, para superar una moción de desestimación, la demanda debe contener suficientes hechos, aceptados como ciertos,

que establezcan una reclamación para un remedio que es plausible de su faz. Iqbal, 556 U.S. pág. 678. El criterio de plausibilidad es distinto a un estándar de probabilidad, y requiere más que la mera posibilidad que el demandado haya actuado de forma ilegal. Id. Las alegaciones fácticas deben ser específicas, ya que la especulación no es suficiente para sostener una causa de acción. Twombly, 550 U.S. a la pág. 570. **De determinar que no cumple con el estándar de plausibilidad, el tribunal debe desestimar la demanda y no permitir que una demanda insuficiente proceda bajo el pretexto de que con el descubrimiento de prueba pueden probarse las alegaciones conclusorias**. R. Hernández Colón, Práctica Jurídica de Puerto Rico, Derecho Procesal Civil, 5ta. Ed., Sec. 2604, pág. 268 (2010).

La norma de Twombly/Iqbal fue adoptada expresamente por el Tribunal de Apelaciones en Fideicomiso Para Ciencia, Tecnología e Investigación Para Puerto Rico v. Forest Farb, No. KAC2012-0126, 2014 WL 3845933, a la *13 (T.A. 2014), tras hallar que "la doctrina allí establecida sobre la plausibilidad de las alegaciones y la suficiencia está acorde con las nuevas Reglas de Procedimiento Civil", y "nos mueven a seguir el criterio de plausibilidad o factibilidad elaborado por el Tribunal Supremo de Estados Unidos" en Twombly/Iqbal. Id., a la *13.[14] A la luz de estos contundentes pronunciamientos, no cabe duda que la norma de Twombly/Iqbal es la que debe guiar al Honorable Tribunal al analizar la suficiencia de las alegaciones de la Demanda Enmendada.

Conforme a este marco doctrinal, procedemos a demostrar que las alegaciones de la Demanda Enmendada son insuficientes bajo los criterios antes esbozados.

### (1) Alegaciones Pertinentes de la Demanda Enmendada

Para evaluar con mayor precisión la suficiencia de las alegaciones pertinentes a la causa de acción bajo la Ley de Monopolios, y para facilitar al Tribunal el análisis de las mismas, procedemos a transcribir íntegramente las limitadas y generales alegaciones relacionadas con la supuesta compra de combustible inferior por parte de la AEE.

---

[14] Véase además Colon Rodriguez v. Universidad De Puerto Rico, No. KDP20130947, 2014 WL 2527222, at *6 (T.A. 2014); Lopez Liciaga v. Estado Libre Asociado de Puerto Rico, No. DDP2014-0134, 2014 WL 5524910, at *2 (T.A. 2014); Colon Torres v. Cooperativa de Ahorro, No. BAC2012-0045, 2015 WL 9305612, at *5 (T.A. 2015).

## IV. ALEGACIONES GENERALES

a. LA COMPRA DE COMBUSTIBLE NO CONFORME A PARAMETROS DE CALIDAD

1. La AEE le factura a sus clientes residenciales de tarifa GRS en base a una tarifa básica, la cual se supone cubra todos los costos no variables, tales como nómina, equipos, mejoras, mantenimiento, administración, facturación y todo otro gasto operacional excepto el combustible y la compra de energía a co-generadoras privadas.

2. El costo del combustible se considera en la tarifa básica a un costo nominal. Cualquier exceso entre dicho valor nominal del combustible en la tarifa básica y el costo real de adquirir el mismo, se recupera a través de la llamada "cláusula de ajuste de combustible" (cláusula de ajuste).

3. La llamada cláusula de ajuste incluye por lo tanto, el exceso del costo del combustible sobre una base de costo de combustible (extremadamente baja) en la tarifa básica. En teoría, este sería el único renglón que debe abarcar, representándolo así la AEE a sus clientes. La cláusula de ajuste, según originalmente aprobada solo contempla el recobro de la diferencia entre el costo base del combustible en la tarifa básica y los incrementos de dicho costo en los mercados mundiales de combustible.

4. La facturación que recibe el cliente residencial solo hace referencia al concepto "compra de combustible", por lo que la representación que la AEE le hace al consumidor residencial de tarifa general es que lo que se factura por ella es solo por concepto de la compra de combustible y no otros conceptos.

5. La AEE, durante los últimos 10 años, adquirió y adquiere diversos combustibles fósiles derivados del petróleo como combustible para operar sus diversas unidades y plantas de producción de energía eléctrica en Puerto Rico.

6. En términos generales, la AEE mayormente utiliza como combustible los denominados combustibles Números 2 y 6. El combustible número 2 es un destilado de petróleo crudo, mientras que el 2 [sic] se clasifica como un combustible residual de este.

7. Algunas unidades o plantas generatrices de la AEE consumen o pueden consumir tanto el combustible número 2 como el 6; otras tan solo utilizan un solo tipo de combustible.

8. Para adquirir estos productos, la AEE circula "Solicitudes de Propuesta" a diversos suplidores. El precio se basa en el diferencial que somete el prospectivo suplidor en relación a un mercado de referencia internacional. La AEE debía entonces conceder el contrato al licitador responsivo que sometiera el menor diferencial.

9. Las solicitudes de propuestas de la AEE también establecen los parámetros de calidad dentro del tipo de combustible a ser adquirido. Específicamente se requieren parámetros de contenido de azufre en el combustible, (típicamente 0.50% o menos), valor calorífico o "BTU" es decir, la cantidad de calor que una determinada unidad de combustible pueda generar, viscosidad, gravedad específica y el nivel de otras sustancias toxicas y/o contaminantes en el combustible; ello para cumplir la AEE con reglamentación ambientales federales y/o estatales.

10. Todos estos parámetros inciden en la calidad y por consiguiente en el precio del combustible adquirido por la AEE. A más estrictos los parámetros, mayor el precio.

11. El factor calorífico del combustible es vital para la eficiencia operacional del sistema eléctrico y de ser inferior la capacidad calorífica de un combustible, tal deficiencia termina siendo pagada por los consumidores residenciales de la AEE a través de la cláusula de ajuste de combustible.  Si el valor calorífico es menor, habrá que adquirir y quemar más combustible para generar la misma cantidad de energía eléctrica.

12. La totalidad del costo de combustible adquirido, menos la base del costo de combustible en la tarifa básica, se le transfieren íntegramente a los consumidores residencial de la AEE a través de la antes descrita cláusula de ajuste.

13. Durante los últimos 10 años, la AEE y su Junta de Gobierno, con conocimiento de causa, ha estado adquiriendo combustibles fósiles de los suplidores co-demandados los cuales no cumplen con los requisitos y criterios de calidad del combustible antes mencionado; pero pagando como si cumplieran con los mismos.

14. Dichas compras se justificaban en la AEE en base a informes de laboratorios alterados, falsificados o manipulados suplidos por laboratorios contratados por los suplidores co-demandados; con el pleno conocimiento de los oficiales de compra de la AEE.

15. En ocasiones los laboratorios variaban o alteraban la calibración de los equipos o la metodología de las pruebas.  Cuando una prueba daba un resultado de no cumplimiento con los parámetros, el suplidor obtenía otra alterada por otro laboratorio con el fin de justificar la venta de un combustible no conforme con los parámetros establecidos en el proceso de compra.  Dichas compras ilícitas favorecían y/o favorecen a la AEE, al permitirle operar sus plantas generatrices con combustibles de menor calidad y así evitar realizar cuantiosas inversiones en equipo e infraestructura, necesarias para poder operar con el combustible de alta calidad que la reglamentación estatal y federal requería.

16. Las referidas compras ilícitas también beneficiaron a los suplidores co-demandados al obtener estos un ingreso superior al pactado en sus contratos con la AEE; al vender un combustible de menor calidad al precio de un combustible de mayor calidad.

Como se demostrará a continuación, estas alegaciones son insuficientes.  Por tanto la Demanda Enmendada debe ser desestimada en cuanto a PAI.

> **(2) Las alegaciones de la Demanda Enmendada no cumplen con los requisitos de la Regla 7.2 de Procedimiento Civil, ni con los criterios de suficiencia y plausibilidad de Twombly**

En términos sustantivos, la Demanda Enmendada alega que los demandados violaron el Artículo 2 de la Ley de Monopolios, que lee como sigue:

> Todo contrato, combinación en forma de trust o en otra forma, o conspiración para restringir irrazonablemente los negocios o el comercio en el Estado Libre Asociado de Puerto Rico o en cualquier sector de éste, por la presente se declaran ilegales y toda persona que haga tales

contratos o se comprometa en tales combinaciones o conspiraciones incurrirá en delito menos grave.

10 L.P.R.A. § 258.

La Demanda Enmendada no alega con la suficiencia requerida los elementos de la causa de acción bajo el citado Artículo 2, a saber: (1) la existencia de un contrato, combinación o conspiración entre dos o más entidades separadas (2) el cual restringe irrazonablemente los negocios o el comercio (3) en Puerto Rico o en cualquier sector de éste. Pressure Vessels, 137 D.P.R. a la pág. 509; General Gases v. Shoring and Forming Systems, 153 D.P.R. 861, 870 (2001). La insuficiencia de lo alegado es tanto bajo la Regla 7.2 de Procedimiento Civil como bajo las normas enunciadas en Twombly sobre cómo debe alegarse la existencia de una conspiración. Veamos.

Al revisar cuidadosamente las alegaciones transcritas, podemos observar que los párrafos 1-4 se limitan a describir a grandes rasgos el proceso de facturación al cliente de la AEE, y la cláusula de ajuste. Demanda Enmendada, pág. 5, ¶¶ 1-4. Los párrafos 5-12, por su parte, se limitan a exponer, también de manera general, el proceso de adquisición de combustible por la AEE, los mecanismos para adquirirlo, los parámetros que regulan el tipo de combustible que se adquiere y su efecto en el precio y rendimiento del producto, y la transferencia de los costos al cliente. Id., ¶¶ 5-12. Solamente cuatro párrafos, los numerados 13-16 (de los más de cien que contiene la demanda), describen, también superficial y someramente, los hechos que según el demandante le dan derecho a reclamar bajo el Artículo 2 de la Ley de Monopolios. Sin embargo, las alegaciones contenidas en estos cuatro párrafos también son insuficientes bajo los estándares aplicables.

En primer lugar, las alegaciones son insuficientes bajo la Regla 7.2, que requiere que "en todas las aseveraciones de fraude o error, las circunstancias que constituyen el fraude o error deberán exponerse detalladamente". 32 L.P.R.A. Ap. V R. 7.2. En esencia, esta regla requiere que la alegación "con particularidad identifique con quién, qué, porqué y dónde fue el fraude". J. A. Cuevas Segarra, op.cit, pág. 433. Las alegaciones transcritas claramente incumplen con este estándar, pues una simple lectura de los cuatro párrafos que describen los hechos alegadamente constitutivos de la supuesta conspiración no menciona quiénes *específicamente* formaron parte del alegado esquema, el rol de cada participante de la conspiración y cuáles fueron las

gestiones que cada uno realizó para adelantar los propósitos de la misma. Tampoco se discuten los propósitos y motivos de cada participante. Nótese que ninguno de los párrafos transcritos tan siquiera menciona a PAI, y se limita a identificar de forma general a los alegados participantes como los "suplidores", los "laboratorios" o "los co-demandados".[15] Las alegaciones tampoco contienen referencias a fechas ciertas, lo que dificulta la presentación de defensas por parte de PAI. Es evidente que la Demanda Enmendada incumple crasamente con la especificidad requerida por la Regla 7.2.

En segundo lugar, las alegaciones relevantes de la Demanda Enmendada son insuficientes bajo las normas enunciadas en Twombly, y discutidas previamente en este escrito. En esencia, dicha norma requiere que quien alegue una conspiración bajo la Sección 1 del Sherman Act (análogo al Artículo 2 de la Ley de Monopolios) alegue hechos que, tomados como ciertos, sugieran un acuerdo conspirativo. Twombly, 550 U.S. a la pág. 564-566. Para ello, hay que alegar algo más que conducta paralela entre las compañías demandadas. Conducta paralela se refiere a actos específicos de cada uno de los demandados que no necesariamente surgen de un acuerdo. Por ejemplo, en Twombly la demanda alegaba que las compañías demandadas evitaban expandir operaciones y competir en territorios que ya ocupan otras de las demandadas, con el propósito de evitar la competencia. Sin embargo, el Tribunal Supremo Federal concluyó que alegar lo que hicieron cada uno de los demandados es insuficiente, y que una "alegación de conducta paralela necesita de algún indicio que sugiera un acuerdo conspirativo". Id., a la pág. 557. (Traducción nuestra).

En el caso de autos, la Demanda Enmendada no alega suficientemente la existencia del primer elemento de la causa de acción bajo el Artículo 2 de la Ley de Monopolios: la existencia de un contrato, combinación o conspiración entre dos o más entidades separadas. Aunque el demandante se refiere de manera superficial a la existencia de una conspiración, éste no provee los detalles de la misma. De hecho, en

---

[15] En la esfera federal, los tribunales han desfavorecido la agrupación de demandados para propósitos de alegar conducta fraudulenta o anticompetitiva. Véase e.g. Ambrosia Coal & Const. Co. v. Pages Morales, 482 F. 3d 1309, 1317 (11th Cir. 2007) (demanda bajo el RICO Act fue desestimada por considerar el tribunal que ésta estaba "devoid of specific allegations with respect to each defendant; plaintiffs lumped together all of the defendants in their allegations of fraud"); Swartz v. KPMG LLP, 476 F. 3d 756, 764-65 (9th Cir. 2007) (resolviendo que "Rule 9 (b) does not allow a complaint to merely lump multiple defendants together but 'require[s] plaintiffs to differentiate their allegations when suing more than one defendant...and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.'")

este caso ni siquiera se alega ninguna conducta paralela de los alegados conspiradores, pues no se dice qué hizo cada cual.  La Demanda Enmendada se limita a decir, en término generales y sin ninguna especificidad, que la AEE "ha estado comprando combustibles fósiles de los suplidores co-demandados los cuales no cumplen con los requisitos y criterios de calidad". Demanda Enmendada, a la pág. 7 ¶ 13. Nuevamente, en esta alegación, ni en las alegaciones transcritas arriba, ni siquiera se menciona a PAI específicamente, y cuál fue su rol en la alegada conspiración.

Tampoco se alega específicamente la existencia de un acuerdo conspirativo. Aunque la Ley de Monopolios no define el término "conspiración", el concepto lleva claramente implícito la existencia de un acuerdo entre los participantes. Por ejemplo, el Art. 152 del Código Penal de 2014 tipifica el delito de conspiración, en lo pertinente, de la siguiente forma: "Constituye conspiración, el convenio o acuerdo, entre dos o más personas para cometer un delito y han formulado planes precisos respecto a la participación de cada cual, el tiempo y el lugar de los hechos". 33 L.P.R.A. § 5334.  Una lectura de la Demanda Enmendada revela la inexistencia de alegaciones sobre acuerdo, convenio, reuniones preparatorias, distribución de funciones, expresión de motivos, planificación de eventos en adelanto de la alegada conspiración y reuniones de seguimiento. Alegar simplemente que los suplidores vendieron combustible inferior a la AEE, con el conocimiento de ésta y de su Junta de Gobierno, aun tomado como cierto, no configura una conspiración bajo la Ley de Monopolios. El alegar que algunos de los supuestos actores tuviesen conocimiento de algún acto impropio de otro de los demandados es insuficiente para establecer la existencia de un acuerdo, que inexorablemente requiere de un concurso de voluntades, de un objeto y de una causa.

La Demanda Enmendada tampoco explica cómo la conducta alegada constituye una "restricción irrazonablemente de los negocios o el comercio". De hecho, la Demanda Enmendada ni siquiera explica cómo la conducta alegada afecta la competencia.  El Tribunal Supremo federal ha identificado varias modalidades de conducta constitutiva de restricción irrazonable *per se* bajo la Sección 1 del *Sherman Act*, y el Tribunal Supremo de Puerto Rico las mencionó en <u>Pressure Vessels</u>. Así, por ejemplo, son irrazonables *per se* ejercicios de (1) fijación de precios, (2) ciertos "concerted refusals to deal", (3) la división horizontal del mercado, y (4) los llamados "tying arrangements". <u>Pressure Vessels</u>, 137 D.P.R. 510 n. 5.  Aquí, sin embargo, la

Demanda Emendada no hace referencia a ninguna de estas modalidades ni a ninguna otra.

Por último, la Demanda Enmendada tampoco contiene alegaciones específicas sobre dónde ocurrieron los actos alegadamente violatorios del Artículo 2 de la Ley de Monopolios. Esto es importante, pues el referido artículo requiere que la restricción ilegal ocurra en Puerto Rico o cualquier sector de éste, según discutido en una sección anterior.

### E. La reclamación del demandante bajo el Artículo 1802 del Código Civil debe ser desestimada por estar prescrita y, en la alternativa, por las alegaciones no configurar una causa de acción viable bajo dicho estatuto.

La Demanda Enmendada sostiene que la conducta imputada a PAI y los otros demandados también constituye una violación al Artículo 1802 del Código Civil de Puerto Rico. 31 L.P.R.A. § 5141. Esto, sin embargo, es incorrecto. Como se demostrará a continuación, cualquier reclamación bajo el Artículo 1802 que el demandante pudo tener a base de los hechos alegados prescribió hace muchos años. Y, de cualquier modo, aun presumiendo que no estuviera prescrita, los hechos alegados no configuran una causa de acción viable bajo dicho estatuto.

El Artículo 1802 del Código Civil de Puerto Rico dispone que el que por acción u omisión cause daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. 31 L.P.R.A. § 5141. Bajo este artículo, todo perjuicio, material o moral, "da lugar a reparación si concurren tres requisitos o elementos: (1) tiene que haber un daño real; (2) debe existir nexo causal entre el daño y la acción u omisión de otra persona, y (3) el acto u omisión tiene que ser culposo o negligente". Bonilla v. Chardón, 118 D.P.R. 599, 610 (1987).

Como se puede observar, para que se configure una causa de acción bajo el Artículo 1802 no basta con que una parte haya incurrido en conducta culposa o negligente, sino que también tiene que verificarse un daño y una relación causal entre el acto culposo y el daño. En cuanto al elemento del "daño", éste se ha definido como "todo menoscabo material o moral causado contraviniendo una norma jurídica, que sufre una persona y del cual haya de responder otra". Lopez v. Porrata Doria, 169 D.P.R. 135, 151 (2006), citando a J. Puig Brutau, Fundamentos de Derecho Civil, Barcelona, Ed. Bosch, 1983, T. 2, Vol. 3, pág. 92. Sin daño o perjuicio no existe la

obligación de indemnizar. Id. La responsabilidad civil "trata de reparar un perjuicio y si éste no queda demostrado, no existirá acto ilícito civil .... El actor ha de demostrar, por tanto, la realidad del daño que le ha sido inferido y su cuantía". Id.

En cuanto al nexo causal requerido, es norma firmemente establecida que "sólo se han de indemnizar los daños que constituyen una consecuencia del hecho que obliga a la indemnización". Estremera v. Inmobiliaria Rac, Inc., 109 D.P.R. 852, 856 (1980). En Puerto Rico rige la doctrina de la causalidad adecuada, lo cual significa que **"no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general"**. (Énfasis nuestro.) Soc. de Gananciales v. Jeronimo Corp., 103 D.P.R. 127, 134 (1974), citando a J. Santos Briz, Derecho de Daños, Madrid, Ed. Rev. Der. Privado, 1963, pág. 215. Este concepto de la causa postula, además, que la ocurrencia del daño que da base a la reclamación debe ser previsible dentro del curso normal de los acontecimientos. **Es decir, causa es la condición que ordinariamente produce el daño, según la experiencia general, y este nexo causal puede romperse ante la ocurrencia de un acto extraño.** Elba A.B.M. v. U.P.R., 125 D.P.R. 294, 310 (1990).

En el caso particular de la acción por daños y perjuicios establecida en el Art. 1802, el término prescriptivo para entablar una reclamación al amparo de ese estatuto es de un año desde que el agraviado supo o debió saber del daño, según dispone el Art. 1868 del mismo Código, 31 L.P.R.A. § 5298; S.L.G. Serrano-Baez v. Foot Locker, 182 D.P.R. 824, 832 (2011).

En el caso de autos, el demandante no tiene disponible una causa de acción bajo el Artículo 1802 toda vez que, como cuestión de umbral, cualquier reclamación que el demandante pudo tener a base de los hechos alegados ya está prescrita. Como se explicó antes en este escrito, los hechos que según el demandante violan el Artículo 1802 y la Ley de Monopolios han estado en el dominio público desde por lo menos el 1999. Los hechos descritos en la sección de prescripción bajo la Ley de Monopolios, que se adoptan por referencia y reiteran en esta sección, reflejan que los cuestionamientos relacionados a compra de combustible inferior en la AEE a base de resultados de laboratorio alterados, estuvieron disponibles al público a través de los litigios federales de Negrón v. Caleb Brett y PREPA v. Caleb Brett; el Informe del Contralor de 13 de mayo de 2002 (que también fue objeto de una vista pública que fue

reseñada en el periódico de circulación general *El Nuevo Día*); en varias resoluciones y proyectos legislativos que se presentaron y discutieron en la Legislatura de Puerto Rico entre el 2005 y el 2009; y a través de varios artículos de periódico que describían las alegaciones que el demandante presenta en la Demanda Enmendada, incluyendo la alegada transferencia al cliente mediante la cláusula de ajuste. Así pues, el demandante sabía o debió saber de su alegado daño cuando estas estuvieron disponibles al público mediante los eventos antes descritos. Dado que el más reciente de ellos ocurrió en el 2009, y la Demanda Enmendada se presentó el 19 de febrero de 2016, es inevitable concluir que la causa de acción bajo el Artículo 1802 está prescrita por haberse presentado la demanda luego de transcurrido un año desde que el demandante supo, o debió saber, del daño alegado.

Independientemente de lo anterior, esta causa de acción debe desestimarse pues los hechos alegados en la Demanda Enmendada no establecen los elementos requeridos por el Artículo 1802. En primer lugar, la Demanda Enmendada no establece con la suficiencia requerida cuál fue la conducta culposa en la que incurrió PAI. Las alegaciones relevantes a la causa de acción en contra de PAI fueron transcritas en este escrito y ninguna menciona a PAI. La Demanda Enmendada solamente menciona, de forma patentemente conclusoria, que "[d]urante los últimos 10 años, la AEE y su Junta de Gobierno, con conocimiento de causa, ha estado adquiriendo combustibles [fósiles] de los suplidores co-demandados los cuales no cumplen con los requisitos y criterios de calidad del combustible antes mencionados; pero pagando como si cumplieran con los mismos". Demanda Enmendada, pág. 7, ¶ 13. En la medida que el demandante se limita a alegar que las acciones las realizaron los "suplidores co-demandados" sin especificar qué hizo cada cual, la alegación es una conclusoria e implausible. Es norma reiterada que al evaluar una moción de desestimación el tribunal solamente tomará como ciertos los hechos bien alegados, expresados de manera clara y concluyente, que no den margen a dudas. Roldán Rosario v. Lutrón, 151 D.P.R. 883, 890 (2000). Bajo este estándar, deben descartarse las alegaciones conclusorias o implausibles. Véase Trinidad Hernández v. E.L.A., 2013 T.S.P.R. 73 *11, citando a R. Hernández Colón, Derecho Procesal Civil, 5ta ed., San Juan, LexisNexis, 2010, pág. 268. Por consiguiente, la Demanda Enmendada no alega con suficiencia el elemento de que PAI haya incurrido en conducta culposa o negligente.

En segundo lugar, la Demanda Enmendada no alega que el demandante haya sufrido un daño compensable. El daño alegado en la Demanda Enmendada—y que según el demandante le da derecho a reclamar bajo la Ley de Monopolios y bajo el Artículo 1802—es que, a raíz de la conducta imputada a los demandados, el demandante y la alegada clase pagaron de más por el producto que obtuvo la AEE de sus suplidores de combustible. Sin embargo, como se demostró en la Sección II(A)(1) (cuyos argumentos reiteramos y adoptamos por referencia en esta sección, bajo la Regla 8.3 de Procedimiento Civil), el alegado daño es inexistente. El demandante y la clase propuesta hubiesen pagado lo mismo bajo la cláusula de ajuste independientemente del alegado acuerdo o conspiración anticompetitiva de los demandados. Ello es así, pues, las regulaciones y contratos pertinentes no le permiten a la AEE adquirir cualquier tipo de combustible (e.g. el más económico), sino que le requieren comprar combustible que cumpla con las reglamentaciones ambientales federales y estatales pertinentes. Por consiguiente, el demandado y los consumidores residenciales hubiesen pagado en sus facturas el mismo precio—esto es, el precio de combustible requerido—aun si no hubiese existido el alegado esquema entre los demandados. **Así pues, el argumento del demandante de que hubiese pagado menos en su factura a no ser por la alegada conducta de los demandados, es completamente inmeritorio.**

En tercer lugar, y presumiendo para propósitos argumentativos que la Demanda Enmendada establece una conducta culposa y un daño (lo que se niega), la reclamación bajo el Artículo 1802 debe ser desestimada pues el demandante no alega un nexo causal suficiente entre la conducta de PAI y el daño alegadamente sufrido. Como se explicó en la Sección II(A)(2), (cuyos argumentos reiteramos y adoptamos por referencia en esta sección, bajo la Regla 8.3 de Procedimiento Civil), no existe un nexo causal directo entre el conducta atribuida a PAI (vender combustible inferior a la AEE) y el daño alegado (sobrecargos en la factura de energía eléctrica de los clientes de la AEE). Esto es así toda vez que el daño alegado no es el resultado directo de alguna conducta de PAI. PAI no es quien le factura a los consumidores de energía de Puerto Rico, y ni siquiera tiene participación en ese ejercicio o en la aplicación de la cláusula de ajuste. Esa es una función que únicamente realiza la AEE. Además, el demandante no tiene relación contractual alguna con PAI. Con quien único PAI tuvo una relación

contractual fue con la AEE, y a dicha corporación pública fue a quien se le vendió el combustible. Por consiguiente, la causa directa del daño alegado por el demandante no es ninguna conducta atribuible a PAI.

Bajo la norma de causalidad adecuada, sólo se han de indemnizar los daños que constituyen una consecuencia del hecho que obliga a la indemnización", y bajo dicho criterio "el nexo causal puede romperse ante la ocurrencia de un acto extraño". Estremera, 109 D.P.R. a la pág. 856; Elba A.B.M., 125 D.P.R. a la pág. 310.  Aquí, el acto de facturación de la AEE—en la que PAI no tiene ningún tipo de participación o injerencia—es la causa próxima del daño alegado. En la medida que no existe una relación causal adecuada entre el alegado daño y alguna conducta de PAI, esta última no responde bajo el Artículo 1802.

### F. La Demanda Enmendada debe ser desestimada por dejar de acumular partes indispensables

La Demanda Enmendada debe ser desestimada por una razón adicional: el demandante deja de acumular partes indispensables. Estas partes indispensables son los laboratorios que según el demandante también participaron en el alegado esquema de suplido de combustible inferior a precios del combustible requerido.

La Regla 16.1 de Procedimiento Civil, 32 L.P.R.A. Ap. V R. 16.1, ofrece la definición de lo que es una parte indispensable, disponiendo que se trata de aquella persona que tiene "un interés común sin cuya presencia no pueda adjudicarse la controversia". Deliz et als. v. Igartúa et als., 158 D.P.R. 403, 432 (2003). Estas personas se harán partes y se acumularán como demandantes o demandadas según corresponda; si una persona que deba unirse como demandante rehusase hacerlo, se podrá unir como demandada. En términos más concretos, una parte indispensable es aquella de la cual no se puede prescindir y cuyo interés en la cuestión es de tal magnitud, que no puede dictarse un decreto final entre las otras partes sin lesionar y afectar radicalmente sus derechos. Deliz, 158 D.P.R. a la pág. 433; Sánchez v. Sánchez, 154 D.P.R. 645, 678 (2001); Rodríguez Rodríguez v. Moreno Rodríguez, 135 D.P.R. 623, 627 (1994). Es decir, los intereses de esa parte "podrían quedar destruidos o inevitablemente afectados por una sentencia dictada estando esa persona ausente del litigio". Fuentes v. Tribl. de Distrito, 73 D.P.R. 959, 981 (1952). En términos más concretos, una parte indispensable es aquella de la cual no se puede prescindir y cuyo

interés en la cuestión es de tal magnitud, que no puede dictarse un decreto final entre

las otras partes sin lesionar y afectar radicalmente sus derechos. Id.

En el caso de autos, el demandante hace, entre otras, las siguientes

alegaciones:

13. Durante los últimos 10 años, la AEE y su Junta de Gobierno, con conocimiento de causa, ha estado adquiriendo combustibles [fósiles] de los suplidores co-demandados los cuales no cumplen con los requisitos y criterios de calidad del combustible antes mencionados; pero pagando como si cumplieran con los mismos.

14. Dichas compras se justificaban en la AEE en base a informes de laboratorios alterados, falsificados o manipulados suplidos por laboratorios contratados por los suplidores co-demandados; con el pleno conocimiento de los oficiales de compra de la AEE.

15. En ocasiones los laboratorios variaban o alteraban la calibración de los equipos o la metodología de las pruebas. Cuando una prueba daba un resultado de no cumplimiento con los parámetros, el suplidor obtenía otra alterada por otro laboratorio con el fin de justificar la venta de un combustible no conforme con los parámetros establecidos en el proceso de compra. Dichas compras ilícitas favorecían y/o favorecen a la AEE, al permitirle operar sus plantas generatrices con combustibles de menor calidad y así evitar realizar cuantiosas inversiones en equipo a infraestructura, necesarias para poder operar con el combustible de alta calidad que la reglamentación estatal y federal requería.

Demanda Enmendada, a la pág. 7, ¶¶ 13-15.

Todas estas alegaciones colocan a los laboratorios que realizaron las pruebas

del combustible adquirido en el centro de las alegaciones que dan base a la Demanda

Enmendada. Sin embargo, ninguno de estos laboratorios—que de hecho, no se

identifican específicamente en la Demanda Enmendada—se ha acumulado como parte.

Esta omisión es de gran envergadura, pues los laboratorios corren el riesgo de que se

adjudique su participación en unos actos sin que éstos tengan la oportunidad de

defenderse. Dada la centralidad de la alegada participación de los laboratorios en los

actos alegados en la Demanda Enmendada, es indiscutible que no puede dictarse un

decreto final entre las otras partes sin lesionar y afectar radicalmente los derechos de

éstas. Toda vez que los laboratorios no fueron acumulados como parte, procede la

desestimación de la Demanda Enmendada bajo la Regla 10.1 (6) de Procedimiento

Civil.

Del mismo modo, señalamos que, por información y creencia, otros suplidores

pueden haberle suplido combustible a la AEE durante el periodo descrito en la

Demanda Enmendada. Sin embargo, solamente se incluyen como demandados a PAI,

STUSCO, Vitol, S.A., Vitol, Inc. y Petrowest.   Estos otros suplidores también serían partes indispensables, por las razones expuestas en cuanto a los laboratorios.

### III.   CONCLUSIÓN Y SÚPLICA

Por los fundamentos antes expuestos, PAI solicita muy respetuosamente de este Honorable Tribunal que declare CON LUGAR la presente Moción y, en consecuencia, desestime con perjuicio la Demanda Enmendada de epígrafe, con cualquier otro pronunciamiento que en derecho proceda.

RESPETUOSAMENTE SOMETIDA.

En San Juan, Puerto Rico, hoy 3 de agosto de 2016.

**CERTIFICO** que en esta misma fecha se envió copia fiel y exacta de este escrito por correo certificado a: **Lcdo. Manuel Fernández Mejías**, 2000 Carr. 8177, Suite 26 PBM 246, Guaynabo, PR 00966; **Lcdo. Alberto Couvertié Barrera**, P.O. Box. 191782, San Juan, PR 00919-1782; **Lcdo. Marco A. Rigau Jiménez**, 33 Calle Resolución, Suite 701-A, San Juan, PR 00920; **Lcdo. Juan Ramírez Camacho**, P.O. Box. 9020192, San Juan, PR 00902-0192.

**McCONNELL VALDÉS LLC**
*Abogados de*
*Petrobras America, Inc.*
P.O. Box 364225, San Juan, PR 00936-4225
Telephone (787) 250-5676 / Fax: (787) 474-9203

Arturo J. García-Solá
RUA No. 8031
ajg@mcvpr.com

Luis R. Román-Negrón
RUA No. 14265
Lrrn@mcvpr.com

Camelia Montilla-Alvarado
RUA No. 10748
cmav@mcvpr.com

Carmen A. Alfonso-Rodríguez
RUA No. 16131
car@mcvpr.com

